[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 18, 2006
THOMAS K. KAHN
CLERK

No. 06-11491
Non-Argument Calendar

_____

D. C. Docket No. 04-61695-CV-MGC

PAUL MIGUEL,
Individually and as the natural parent
and legal guardian for VINNY GARGANO, a minor child,

Plaintiff-Counter-Defendant-Appellant,

versus

METROPOLITAN LIFE INSURANCE COMPANY,

Defendant-Counter-Claimant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 18, 2006)

Before ANDERSON, CARNES and PRYOR, Circuit Judges.

PER CURIAM:

This is an appeal from a grant of summary judgment in favor of Appellee Metropolitan Life Insurance Company on its counterclaim for statutory rescission of a life insurance policy under which appellant and his son were the named beneficiaries. After a review of the parties' briefs, the record, and the relevant law, we find no reversible error. Accordingly, the judgment of the district court is affirmed.

In 2002, Metropolitan Life Insurance Company (MetLife) issued a $500,000 life insurance policy to Anne M. Birchenough. Listed on the policy as named beneficiaries were Appellant Paul Miguel and his minor son, Vinny Gargano. MetLife reinsured the full amount of the policy through RGA Reinsurance Company (RGA). When Birchenough died in 2003 from cardiopulmonary arrest, Miguel filed a claim with MetLife for benefits under the policy.

Following an investigation into the circumstances of Birchenough's death, MetLife refused to pay, asserting that it was entitled under Florida law to rescind the policy because Birchenough, in her insurance application, made misstatements and omissions regarding a prior hospitalization. MetLife further asserted that it would not have issued the policy had it known the true facts about Birchenough's past medical treatment.

Miguel filed a declaratory-judgment action against MetLife in the Circuit

2

Court of Broward County, Florida, seeking benefits under the policy. On the basis of diversity jurisdiction, MetLife removed the case to the United States District Court for the Southern District of Florida and filed a counterclaim for rescission under Fla. Stat. Ann. § 627.409(1). Following discovery, the parties filed cross-motions for summary judgment.

On January 26, 2006, the district court granted summary judgment in favor of MetLife, holding that MetLife was entitled to rescind the policy.[1] Specifically, the court determined that: Birchenough's insurance application contained numerous misstatements and omissions regarding her medical history; those misstatements and omissions were material to the risk MetLife agreed to assume in issuing the policy; MetLife relied on the misstatements and omissions in issuing the policy; and MetLife did not waive its right to rescind the policy because it was under no duty to conduct an independent investigation of Birchenough's medical history. Miguel timely appealed.

On appeal, Miguel argues that the district court erred in granting summary judgment for MetLife because:

---

[1] It is true, as Miguel points out in his brief, that the district court, in its January 26 Order, did not expressly mention his motion for summary judgment. But given the fact that the claim underlying Miguel's motion was for payment on the policy, we treat his motion as having necessarily been denied by the granting of MetLife's motion for summary judgment, which rescinded the policy.

3

(1)    the district court resolved in MetLife's favor disputed issues of fact

concerning whether Birchenough intentionally made misstatements

and omissions in her application;

(2)    MetLife's decision to reinsure Birchenough's policy (by transferring

the "entire risk" to RGA) means that it bore no risk in deciding to

issue the policy and, consequently, cannot rescind the policy under

§ 627.409(1)(a); and

(3)    MetLife waived its right to rescind the policy by not conducting an

adequate investigation into Birchenough's medical history.

I.

<u>September 2001 Hospitalization</u>

On September 5, 2001, Birchenough, 73 years old at the time, was transported by ambulance from her home to Hollywood Medical Center, a local hospital, after complaining of chest pains. She was admitted to the emergency room, where she reported symptoms of chest pain, chest heaviness, and shortness of breath. Birchenough was examined in the emergency room by Dr. Ebrahim Mostoufi-Moab, a cardiologist who had been called in to determine whether she had suffered a heart attack. Dr. Mostoufi-Moab found Birchenough to be in acute distress and determined that her condition was critical.

Based on his observations, Dr. Mostoufi-Moab ordered Birchenough to undergo a battery of tests. The results of those tests confirmed that she had suffered, or was currently suffering, an acute heart attack. After her admission to the hospital, Birchenough's condition steadily deteriorated, and she began to have increased breathing difficulties and renal failure.

Based on Birchenough's breathing difficulties, Dr. Mostoufi-Moab arranged for her to be examined by one of the hospital's pulmonologists, Dr. Ronald Gup. When Dr. Gup first saw Birchenough on September 7, he noted that she appeared to be suffering from congestive heart failure. He also noted that the symptoms she exhibited were consistent with a condition known as COPD, which stands for chronic obstructive pulmonary disease. At the time of Dr. Gup's initial examination, Birchenough was not conscious and was unable to breathe on her own, which led to her being placed on mechanical respiratory support. Dr. Gup noted in his treatment report that Birchenough's prognosis was "guarded," a prognosis he later explained as meaning that the patient's life is in significant danger.

The renal failure that Dr. Mostoufi-Moab observed upon Birchenough's admission to the hospital led him to arrange a second consultation with one of the hospital's nephrologists, Dr. Robert Levinson.

Dr. Levison, however, was not available at the time the consult was ordered, so Dr. Van Gelder, another of the hospital's nephrologists, was the first kidney specialist to examine Birchenough. Dr. Van Gelder saw Birchenough on September 8, at which time he found her to be suffering from mild underlying chronic kidney insufficiency.

Dr. Levinson, upon his return, took over treating Birchenough's renal failure, which ultimately stabilized during her stay at the hospital. Though Birchenough's renal condition eventually improved with treatment, Dr. Levinson testified in his deposition that, at the time she was first examined by Dr. Van Gelder, her condition was serious and potentially very serious.

By September 12, Dr. Mostoufi-Moab noted that Birchenough's condition had improved substantially. She no longer had any complaints of pain and was in no acute distress. Birchenough's vital signs were stable, but, though conscious, she appeared to be somewhat disoriented at times. Dr. Mostoufi-Moab attributed her disorientation to organic brain syndrome, something often seen in older patients during times of stress or stress recovery.

Dr. Mostoufi-Moab saw Birchenough again the following day, September 13. He noted that she was alert, oriented, and in no acute distress. Again, Birchenough had no complaints regarding chest pain or difficulty breathing. Dr.

6

Mostoufi-Moab met with Birchenough and two of her family members to discuss Birchenough's discharge from the hospital and her future course of treatment. Birchenough was discharged from Hollywood Medical Center on September 14.

<u>December 2001 Application for Life Insurance</u>

Three months after being discharged from the hospital, Birchenough applied for a life insurance policy from MetLife. She filled out Part A of the insurance application on December 13, 2001, and Part B of the application on December 17, 2001.

In Part A of the application, Birchenough answered "no" when asked whether she had ever been treated for "shortness of breath or chest pain." She also answered "no" when asked whether she had ever been treated for a "heart disorder" or a "disorder of the . . . kidneys." Immediately following those answers, in a space on the application provided for additional information, Birchenough wrote "Hollywood Memorial Hospital"[2] under the section labeled "Name/Address of Physician."[3] She wrote "09/2001" under the section labeled "Date/Duration of Illness." And, under the section labeled

---

[2] The name of the hospital where Birchenough was treated in September 2001 is "Hollywood Medical Center."

[3] She listed her physician as Dr. Joseph DeLeeuw, 599 S. Federal Hwy., Dania, FL 33004, 954-920-4911.

7

"Diagnosis/Severity/Treatment," Birchenough wrote "pneumonia – Mild, currently – All OK." That is the only explanation Birchenough gave regarding the circumstances of her nine-day hospitalization just three months before. At the conclusion of Part A, Birchenough signed the application under the "Agreement" section, which stated that "I have read this application including any supplements and *to the best of my knowledge and belief*, all statements are *true* and *complete*."

In Part B of the application, Birchenough again answered "no" when asked if she had "EVER had or received treatment . . . for . . . chest pain." And she again answered that she had never been treated for a heart disorder or "any disease of the kidney." On the last page of Part B of the application, Birchenough signed her name under a statement that said the answers therein "have been correctly written, as given by me, and are *true and complete to the best of my knowledge and belief*."

As part of the application process, MetLife also required Birchenough to undergo a medical examination by Dr. Arthur Lodato, one of MetLife's representatives. The results of that examination disclosed no concerns about Birchenough's health status, and Dr. Lodato noted that her health was "good for her age." Lab results, however, did show a slightly low level of albumin. As the final step in the application process, MetLife obtained records from Birchenough's designated primary physician, Dr. Jack Drimmer. His notes indicated that

Birchenough had been seen for pneumonia in September 2001, but did not contain any further information about her hospitalization.

Birchenough's life insurance application was forwarded to MetLife's underwriting division. After reviewing the application, the underwriter determined, based on her low albumin level and her treatment for pneumonia, that MetLife should not issue Birchenough a policy. The underwriter nevertheless decided, though, that Birchenough's application was a possible candidate for reinsurance. That decision was made based on what was then understood to be Birchenough's medical history. RGA agreed to reinsure the full amount of the proposed insurance policy, and MetLife issued Birchenough a policy in the amount of $500,000 on February 15, 2002.

## II.

We review de novo a district court's grant of summary judgment, applying the same standards that bound the district court and viewing the evidence and all reasonable inferences in the light most favorable to the non-moving party. See Drago v. Jenne, 453 F.3d 1301, 1305 (11th Cir. 2006). "Summary judgment is appropriate when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(c)).

III.

A.

In Florida, rescission of an insurance policy on the basis of a misstatement or omission in the insurance application is governed by Fla. Stat. Ann. § 627.409. That statute, which we must apply in this case, provides in relevant part:

> (1) Any statement . . . made by . . . an insured . . . in an application for an insurance policy . . . is a representation and is not a warranty.  A misrepresentation, omission, concealment of fact, or incorrect statement may prevent recovery under the . . . policy only if any of the following apply:
> (a) The misrepresentation, omission, concealment, or statement is fraudulent or is material either to the acceptance of the risk or to the hazard assumed by the insurer.
> (b) If the true facts had been known to the insurer pursuant to a policy requirement or other requirement, the insurer in good faith would not have issued the policy or contract, would not have issued it at the same premium rate, would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss.

Fla. Stat. Ann. § 627.409(1)(a), (b) (2005).  "This Court has found that 'an essential prerequisite to the application of Florida Statutes section 627.409(1) is that the insured make an inaccurate statement in his application.'"  Hauser v. Life Gen. Sec. Ins. Co., 56 F.3d 1330, 1334 (11th Cir. 1995) (quoting William Penn Life Ins. Co. of New York v. Sands, 912 F.2d 1359, 1362 (11th Cir. 1990)).[4]

---

[4] Both Hauser and Sands involved a prior version of § 627.409(1).  Apart from minor phrasing differences, however, the current version—which governs this case and which is quoted

10

Given this essential prerequisite, we must first determine whether Birchenough made any inaccurate statements in her life insurance application. Miguel concedes, as he must, that Birchenough made statements in her application that were not accurate in light of the treatment she received during her September hospitalization, as reflected by the medical evidence in the record. For instance, Birchenough denied ever having received treatment for chest pain, shortness of breath, or disorders involving her heart or kidneys. The medical evidence demonstrates that she in fact received treatment for all of those things. Her statements to the contrary were therefore inaccurate.

Ordinarily, the discrepancies between the facts as stated by Birchenough in the application (that she had not been treated for the conditions listed above) and the facts as established by the medical evidence (that she had in fact been treated for those conditions) would suffice to show the requisite inaccuracy for purposes of § 627.409(1). That is because, apart from an allegation of fraud, which MetLife does not make in this case, even an unintentional misstatement or omission in an insurance application can constitute grounds for rescission under the statute, assuming, as discussed below, the insurer can satisfy the other elements of either subsection (a) or (b). See Hauser, 56 F.3d at 1334. Importantly, however, in this

in the text—is materially indistinguishable from the prior version.

11

case MetLife must show something more than a simple inaccuracy to trigger the statute's application.

As both parties concede, we are not concerned with the simple truth or falsity of Birchenough's statements. Instead, because the language used by MetLife in its insurance application required Birchenough to affirm that her statements were true "to the best of [her] knowledge and belief," we must determine whether she actually believed her statements to be true at the time she made them. See id. (noting that the use of "knowledge and belief" contractual language in an insurance application "impose[s] a different requirement of accuracy than that provided in § 627.409(1)").

As we noted in Hauser, "[w]here the language an insurance company chooses in its insurance application shifts the focus from a determination of truth or falsity of an applicant's statements to an inquiry into whether the applicant believed the statements to be true, the applicant's answers must be assessed in light of his actual knowledge or belief." Id. (citing Sands, 912 F.2d at 1363). But "the presence of a 'knowledge and belief' provision in a policy will not insulate an applicant's responses from all review." Id. at 1335. In assessing an applicant's responses to questions on an application employing "knowledge and belief" language, we apply the following test:

12

> [T]he twin qualifiers [knowledge and belief] require[] that knowledge not defy belief. . . . What the applicant in fact believed to be true is the determining factor in judging the truth or falsity of his answer, *but only so far as that belief is not clearly contradicted by the factual knowledge on which it is based*. In any event, a court may properly find a statement false as a matter of law, however sincerely it may be believed. To conclude otherwise would be to place insurance companies at the mercy of those capable of the most invincible self-deception—persons who having witnessed the Apollo landing still believe the moon is made of cheese.

Id. (quoting Sands, 912 F.2d at 1365)

Applying this test, we have no trouble concluding that when Birchenough denied in her application ever having received treatment for chest pain and shortness of breath, she made statements that were false as a matter of law. On September 5, 2001, Birchenough summoned an ambulance to her home because she was suffering from chest pain and shortness of breath. She reported these symptoms both to the EMT personnel and to the admitting physician at the Hollywood Medical Center, as noted by cardiologist Dr. Mostoufi-Moab. Even assuming for some reason that Birchenough believed she had never been treated for chest pain or shortness of breath, any such belief was clearly contradicted by facts known to her—specifically, her own complaints regarding these symptoms and the hospitalization that followed as direct result. See Mims v. Old Line Life Ins. Co. of Am., 46 F. Supp. 2d 1251, 1257 (M.D. Fla. 1999). Thus, her denials in

13

this regard qualify as misstatements under § 627.409.[5]

B.

Having determined that Birchenough made statements in her application that were false as a matter of law, regardless of her "belief"—that is, statements she said she believed, but which were clearly contradicted by facts known to her—we must now turn to the question whether MetLife can satisfy the remaining elements of the statute. As MetLife points out, and as Miguel concedes, the statute makes plain that subsections (a) and (b) are written in the disjunctive. Fla. Stat. Ann. § 627.409(1) (". . . may prevent recovery under the . . . policy only if *any* of the following apply"). Thus, MetLife is entitled to rescind the policy only if it can show *either* that Birchenough made misrepresentations in her application that were "material either to the acceptance of the risk or to the hazard assumed by the insurer" *or* that it would not have issued the policy (or would have issued it under different terms) had it known the true facts of her medical history.

---

[5] Birchenough also denied in her application ever having received treatment for a kidney or heart disorder. The medical evidence in the record, which clearly establishes that she was treated for both during the course of her September 2001 hospitalization, contradicts her denials. Pointing out that Birchenough was in and out of consciousness during her hospitalization, and that she therefore may not have known what specific disorders she was being treated for, Miguel argues that disputed issues of fact exist regarding whether Birchenough "knew and believed" that she had received treatment for an acute heart attack, renal failure, and congestive heart failure. We need not address those arguments because we are satisfied that the undisputed facts show that her statements regarding chest pain and shortness of breath were "misstatements" within the meaning § 627.409, as modified by Sands and Hauser.

14

In arguing that MetLife is not entitled to summary judgment, Miguel focuses almost exclusively on subsection (a) of the statute and the use of the phrase "acceptance of the risk" in that subsection. Miguel's argument against rescission under subsection (a) is this: In order to rescind an insurance policy under that subsection, the insurer must be able to show that the misstatement was material "to the acceptance of the risk . . . by the insurer," and, Miguel contends, MetLife did not assume any risk in issuing the policy because RGA reinsured the policy for the full amount. Thus, according to Miguel, because RGA is the only party who assumed any risk under the policy, MetLife cannot show that any statement made by Birchenough was material to a risk it agreed to accept. We need not address the merits of Miguel's "reinsurance/no-risk" argument, however, because we conclude that MetLife has demonstrated its entitlement to rescission under subsection (b).

Under subsection (b), an insurer is entitled to rescind its insurance policy if it can show that the policy would not have been issued, or would have been issued under different terms, "[i]f the *true* facts had been known to the insurer"—that is, the facts that were omitted, concealed, or misstated in the application. Fla. Stat. Ann. § 627.409(1)(b). To show that it was entitled to rescind Birchenough's policy under this subsection, MetLife submitted an affidavit given by Dr. Irvin

15

Heifetz, M.D.  Dr. Heifetz is the Vice President of MetLife's Life New Business

Department and is the Medical Director in MetLife's Boston office.

When an insured dies and MetLife suspects that the insured may have made

misrepresentations in his or her life insurance application, it is part of Dr.

Heifetz's duties at MetLife to review the claims file to "determine[] whether a

misrepresentation has occurred, whether that misrepresentation is material to the

underwriting process, and whether, if MetLife had known the insured's true

medical history, it would have issued the life insurance policy under the same

terms as it was eventually issued."  Heifetz Aff. ¶4.  During his investigation, Dr.

Heifetz reviewed Birchenough's insurance application and the medical files from

her September 2001 hospitalization.  He determined that a number of the

responses in her application, including those in which she denied having been

treated for chest pain and shortness of breath, were not truthful in light of the

treatment she received during September 2001.  He further found that

Birchenough's policy was issued solely on the basis of the responses she provided

in her application and that the information solicited by the application's questions,

including information concerning treatment for chest pain and breathing difficulty,

was "material from an underwriting perspective."  Id. ¶¶ 7, 9, 12.

After reviewing Birchenough's application and MetLife's underwriting

16

guidelines, Dr. Heifetz ultimately concluded that, "had Ms. Birchenough answered truthfully regarding having been hospitalized at Hollywood Medical Center for *chest pain, chest heaviness, and shortness of breath*" in addition to the other treatment she received, "MetLife would not have sent out Ms. Birchenough's application for reinsurance and would not have issued coverage under the subject life insurance policy." Id. ¶13. Dr. Heifetz's deposition testimony confirms this conclusion. Heifetz Dep. at 87.

Dr. Heifetz's testimony is uncontroverted. Miguel has not presented any evidence to rebut the conclusions attested to by Dr. Heifetz in his affidavit or in his deposition. Instead, Miguel suggests that the conclusions in Dr. Heifetz's affidavit are inconsistent with Dr. Heifetz's own deposition testimony, that the conclusions in his affidavit are speculative and conclusory, and that these inconsistencies and conclusions create an issue of credibility in need of jury resolution. We disagree. We do not find any inconsistencies between Dr. Heifetz's affidavit and his deposition testimony. Moreover, we conclude that, because he has not presented any evidence to rebut or contradict Dr. Heifetz's conclusion that MetLife would not have issued the policy had it known the true reasons for Birchenough's hospitalization, Miguel has failed to create a genuine issue of material fact with respect to MetLife's entitlement to rescission under

17

subsection (b) of § 627.409(1).

C.

Finally, Miguel argues that MetLife waived its right to rescind the policy by not conducting an adequate investigation into Birchenough's medical history prior to issuing the policy. Specifically, Miguel argues that Birchenough's low albumin level (as indicated by her physical exam),[6] combined with her response on Part A of the application in which she wrote "Hollywood Memorial" – "9/2001" – "pneumonia – Mild, currently – All OK", should have prompted MetLife to conduct a more in-depth investigation into her medical history. Miguel argues that a reasonable investigation would have led MetLife to request the medical records from September 2001, and that, because MetLife did not perform such an investigation, it cannot now rescind the policy on the basis of information contained in those medical records.

As support for his argument, Miguel cites <u>Cox v. Am. Pioneer Life Ins. Co.</u>, 626 So. 2d 243, 246 (Fla. 5th DCA 1993), in which the court noted that "[w]here an insurer is on notice that it must itself make further inquiries about an insured's health, it is bound by what a reasonable investigation would have shown."

---

[6] Dr. Heifetz testified that low albumin is a "very nonspecific," general marker of increased mortality. Contrary to Miguel's assertion, Dr. Heifetz did not state in his deposition that there is a link between low albumin and heart disease.

18

Cox states, and Miguel's waiver argument relies upon, an exception to the general rule under Florida law regarding the obligation of insurers to investigate the information contained in insurance applications. The general rule is that "[a]n insurer is entitled, as a matter of law, to rely upon the accuracy of the information contained in the application and has no duty to make additional inquiry." Ind. Fire. Ins. Co. v. Arvidson, 604 So. 2d 854, 856 (Fla. 4th DCA 1992).

We find that the exception expressed in Cox is inapplicable on this record. The Cox exception is inapplicable because neither Birchenough's low albumin level nor her innocuous statement that she had been treated for a "mild" case of pneumonia (which in December 2001 was "all OK") were sufficient to place MetLife under a legal obligation to request the hospital records from Memorial Medical Center as part of its assessment of her insurance application. See Shelby Life Ins. Co. v. Paolasini, 489 So. 2d 89, 91 (Fla. 3d DCA 1986). Metlife thus properly relied on the representations in Birchenough's application as it was entitled to do and did not waive its right to seek rescission under the circumstances presented here.

## IV.

For the foregoing reasons, we conclude that there are no genuine issues of material fact and that MetLife is entitled to judgment as a matter of law.

Accordingly, the judgment of the district court is

AFFIRMED.